THE RECTOR, CHURCHWARDENS AND VESTRYMEN OF THE CHURCH OF THE REDEMPTION, Appellants, *v.* THE RECTOR, CHURCHWARDENS AND VESTRYMEN OF GRACE CHURCH, Respondents.

Religious societies incorporated under the act of 1801 (chap. 79, Laws of 1801, having been confirmed by the act of 1813, § 13, chap. 60, R. L., 1813), are included in the provisions of the act of 1850 (chap. 122, Laws of 1850), enlarging the powers of religious corporations organized under the act of 1813.

Under the act of 1813 (§ 4), property, both real and personal, may be held in trust for the use of an unincorporated religious society without any restriction as to time, except that it shall terminate upon the lawful incorporation of the religious society, when, by virtue of the act, the title vests in the corporation.

The trust may be shown by parol as well as by deed.

The same rule governs as to personal property held by an incorporated religious society for the use of an unincorporated society as if it were held by natural persons.

A religious corporaton, proceeding under the act of 1850 to establish an associate church or chapel, cannot retain personal property purchased for the use of the congregation worshiping in such associate church by its members, and in view of, and with a declared purpose of a separate incorporation, after such incorporation is perfected, although perfected without the consent of the parent society.

Prior to 1850, defendant, a religious corporation, raised moneys by voluntary contributions, to buy ground and erect a building for a free chapel. Land was purchased, the title being taken in defendant's corporate name, with a condition that it should always be appropriated for the use of such congregation as defendant might deem proper, and, if sold, that the proceeds should go to the purchase of other lands and the erection of other buildings to be used in the same manner. The building erected was used in compliance with the condition until a religious society was incorporated from the stated worshipers in it, when the premises were sold. Meanwhile one of defendant's corporators, with the aid of its rector, and others of its congregation, gathered a congregation in another part of the city, the expenses being paid, principally, by contributions from those attending defendant's meetings. With the avails of such sale, and other moneys from its treasury, and moneys raised by mortgage, and from subscriptions of persons who afterwards became corporate members of plaintiff's society, land was purchased and conveyed to defendant, a building for worship erected, and personal property bought. Plaintiff was incorporated from those

attending religious services in the new building, under the act of 1813, without defendant's consent. In an action to determine the title to the property, *held*, that the new congregation were, within the intent of the act of 1850, members of the defendant, so that under that act it was authorized to purchase land and erect a "convenient chapel" for their accommodation ; that its title to the real estate was not divested by the incorporation of plaintiff, without its consent; and that defendant was entitled thereto, although partially paid for by contributions obtained by and from plaintiff's congregation ; but that the personal property purchased at the expense or by the efforts of such congregation, avowedly for its use and in view of a separate organization, was held for the use of the congregation; and plaintiff upon its incorporation acquired and had a title thereto.

Also, *held*, that the fact that defendant, at the time of the purchase of the real estate in question, already held property the income of which was greater than the law allowed to religious corporations, did not support or aid plaintiff's claim, and was immaterial.

It is for the State to make inquiry into an excess on the part of a religious corporation in its accumulation ; to enable a person or other corporation so to do he must be in a position to claim an interest in the property if it is adjudged that the nominal owner may not.

It *seems*, that the consent of a religious corporation to the incorporation of a society so using its real estate, in order to pass the title of such real estate from the former to the new corporation, should be in writing.

*Rector, etc.*, v. *Rector, etc.* (6 Hun, 166), modified.

(Argued January 22, 1877 ; decided March 20, 1877.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, affirming a judgment in favor of defendant. (Reported below, 6 Hun, 166.)

This action was brought to determine the rights of the respective parties to certain real estate in the city of New York, used for church purposes, and to certain personal property consisting of carpets, an organ and other furniture in use in the church building.

During the pendency of the action the building and personal property were destroyed by fire ; defendant collecting the insurance, plaintiff, by supplementary complaint, set up these facts, claiming the insurance money.

The facts found by the court are substantially as follows :

The defendant in this action is a body corporate, located in the city of New York, whose certificate of organization as

such was duly filed in the office of the register of the said city on the 4th day of January, 1809, under the law providing for the incorporation of Protestant Episcopal churches, passed March 27, 1801. (Chap. 79.) The plaintiff is a corporation formed under the act of 1813, as an Episcopal church. Prior to the year 1850 the defendant, for the purpose of establishing a free chapel, raised the sum of $14,000 by voluntary contributions, and purchased a site at the corner of Madison avenue and Twenty-eighth street, and there erected a building. The title to said property was not then taken in the name of the defendants. At the request of the contributors of the said sums, the title to the property and chapel so erected was, in June, 1850, vested in the defendant, upon the agreement and trust which the defendant then accepted, that the said chapel should be appropriated to the use of such congregation as the defendant's vestry might deem proper; such congregation to have the election of their own minister, subject, however, to the approval of the rector for the time being of the defendant; that the minister officiating in such chapel should be supported, and all current expenses incident to the use of the said chapel, and the provisions for keeping the same in repair, should be borne by such congregation; and that if at any time thereafter it should, in the judgment of defendant's vestry, be deemed expedient to sell and dispose of the said chapel, with its site, such vestry should have full power and be at liberty to do so; but the proceeds of the same should be appropriated to the purchase of other land and the erection of other church buildings thereon, to be held, managed, and used in the same manner as was thus arranged in regard to the said chapel. Thereupon, in conformity with such arrangement and trust, the defendant appropriated the said chapel to the use of a congregation which had become stated worshippers therein. Such congregation, in the year 1852, with the consent of the defendant, became incorporated under the name of the Church of the Incarnation, and for some years occupied the said church edifice under a lease thereof from the defendant, and in the year 1856 contracted to purchase the same of defendant.

Meantime, one of the parishioners of the defendant, with the co-operation of the defendant's rector, started a Sunday school in Eleventh street, in the same city, and succeeded in bringing in the parents of the children as attendants at public worship in connection with such Sunday school, and in securing the assistance of others in such work, and in obtaining the services of a minister. The expenses of the rental of the church building occupied for such purposes and the other expenses, together with a stated monthly stipend to the said minister (the balance of whose salary was contributed by the attendants of such undertaking) were defrayed out of the contributions of the parishioners of the defendant to the offertory at their regular church edifice. A lecture room was subsequently leased in Astor place. The said undertaking and mission after 1857 was styled "Grace mission," or "Grace chapel," and was also known as the "Astor place mission." In 1859, the purchase of the said church building on Madison avenue having been about completed, the defendant applied for and obtained from the Supreme Court, under the statute in such case made and provided, permission to sell and convey the same. In its said petition, the defendant set up the terms upon which it had acquired and held the said property, and stated that it proposed and intended to apply the moneys arising from the sale of said lands to the purchase of other lands in the city of New York for the site of a chapel, and to erect a chapel thereon, and prayed that the court order such application to be made. This court, in sanctioning such sale and conveyance, directed that the defendant apply the moneys arising from the sale of said lands, for the purposes in said petition, in that respect stated. In the same year defendant purchased the real estate in question, paying in all the sum of $21,500. Of this sum $14,000 were the proceeds of the sale of the said property on Madison avenue, and the balance was paid out of moneys collected by the attendants at the services at the said mission; the conveyance of the land was by deed to the defendant. The erection of a chapel building was thereupon proceeded with, and

in the building contracts either the defendant or its rector was named as the contracting party. The total cost of the chapel and site, including upholstery and the organ therein, was the sum of $57,711.15 ; of this sum, $37,705.64 was paid by defendant out of its corporate fund; $2,860.67 additional was expended by the defendant's rector, but not reimbursed him by its treasurer; $15,000 was obtained by the defendant, with the permission of the court, upon a mortgage for that sum, executed by the defendant upon the said chapel and site. The balance of such cost was defrayed out of subscriptions received through members of the said mission congregation. The congregation worshiping in such new church purchased an organ at a cost of about $1,900, made additions to it at a further cost of $400, and purchased and received as gifts various other articles of personal property. In 1866 plaintiff was incorporated, the corporators being members of the congregation attending worship in said new church. No consent by defendant to such incorporation was ever applied for or granted. In 1868, difficulties and dissensions having sprung up in plaintiff's society, resulting in litigations, defendant took possession of the new church with the personal property therein, being the property in question. In December, 1872, the property was destroyed by fire. It was insured by defendant in its own name, and it collected upon such insurance $43.125 upon the building, and $9,000 upon the organ and furniture. At the time of the purchase by and conveyance to defendant of the lands in question, it had property besides its church edifice producing income exceeding $6,000 per annum.

Further facts appear in the opinion.

*Charles F. Tracy* for the appellant. Plaintiff's rights to its property were given under chapter 60, Laws of 1813, and the act of 1850 (chap. 122) is not applicable. (Hoffman's Ec. Law of N. Y., 174; *Bap. Ch.* v. *Witherall,* 3 Paige, 296; *R. P. D. Ch.* v. *Mott,* 7 id., 77; *Ayres* v. *M. E. Ch.,* 3 Sandf. Ch., 363.) The statutes respecting uses and trusts do not

apply to religious incorporations. (*Wetmore* v. *Parker*, 52 N. Y., 457, 458; *Williams* v. *Williams*, 4 Seld., 525; *Safford* v. *Hynds*, 39 Barb., 625; *Foote* v. *Foote*, 58 id., 258; *Swinburne* v. *Swinburne*, 28 N. Y., 568; *Sieman* v. *Shurck*, 29 id., 598; *Lounsbury* v. *Purdy*, 18 id., 515; *Foote* v. *Bryan*, 44 id., 544.) Plaintiff had a right to prove that at the time of the conveyance to defendant it held more property than the law allowed, to show that it received the title as agent or trustee for plaintiff. (*Chamberlain* v. *Chamberlain*, 43 N. Y., 425; *Harris* v. *Am. Bible Soc.*, 2 Abb. Ct. App. Dec., 321.)

*Clarkson N. Potter* for the respondent. A trust other than a resulting trust must be manifested or proved by writing. (*Jackson* v. *Moore*, 6 Cow., 225; Story's Eq. Jur., § 972; Lewin on Trusts, 30; *Sturtevant* v. *Sturtevant*, 20 N. Y., 40; *Throop* v. *Hatch*, 3 Abb., 28; *Voorhees* v. *Presb. Ch.*, 17 Barb., 107.) No trust results to or for the one paying the money for land if the title be taken by another with his consent or knowledge. (*Bodine* v. *Edwards*, 10 Paige, 505; *Norton* v. *Stone*, 8 id., 222; *Day* v. *Rollins*, 18 N. Y., 455; *Sturtevant* v. *Sturtevant*, 20 id., 59; *Foot* v. *Bryant*, 47 id., 544.) To create a resulting trust, the money must be for the whole purchase or for a definite and aliquot part. (*White* v. *Burr*, 2 Paige, 238–240; *Sayre* v. *Townsends*, 15 Wend., 647; *Coulter* v. *Tuttle*, 4 Greene [N. J.], 549.) In order to raise a resulting trust, strict proof is required. (*Jackson* v. *Moore*, 6 Cow., 726; *Foot* v. *Bryant*, 47 N. Y., 547; Story Eq., § 764; *Owens* v. *Baldwin*, 1 Md. Ch. D., 7, 123.) If this $17,000 had been collected on a declared trust, specially for the "Dickson congregation," the trust would have been invalid for the uncertainty of the beneficiaries, and could not be enforced. (*Jackson* v. *Cory*, 8 J. R., 286; *Levy* v. *Levy*; 33 N. Y., 102; *Bascomb* v. *Albertson*, 34 id., 612; *Gram* v. *Ger. Soc.*, 36 id., 162; *Owen* v. *Mis. Soc.*, 14 id., 384; *Robie* v. *Sedgwick*, 35 Barb., 328; *White* v. *Howard*, 52 id., 308; 4 Kent, 34; *Leggett* v. *Dubois*, 5 Paige, 114, 117.) Plaintiff did not acquire through incorporation any rights in respect of

this $17,000. (*Robertson* v. *Bullions*, 1 Kern., 264; *Young* v. *Christ Church*, 31 Barb., 53; *Petty* v. *Tooker*, 21 N. Y., 270.) There was nothing to prevent defendant from taking and holding the property. (*Humbert* v. *Trinity Ch.*, 24 Wend., 629; *Bogardus* v. *Trinity Ch.*, 4 Sandf. Ch., 758; *Steam Nav. Co.* v. *Weed*, 17 Barb., 378, 383; *Reformed Ch.*, 7 How. Pr., 477; *Trustees Vernon* v. *Hill*, 6 Cow., 26; *Stern* v. *Bloom*, 5 J. Ch., 379, 381; *Harpending* v. *Dutch Ch.*, 16 Pet., 492.)

FOLGER, J. The first point made by the appellant is, that the statute of 1850 is not applicable to this case; (Laws of 1850, chap. 122, pp., 195, 196, § 2.) That is an act which enlarges the powers of a religious corporation. In strictness of terms it is confined in its effect to religious societies incorporated under the act of 1813 (R. L. chap. 60, April 5, 1813), or by special charter. By it such religious society may purchase and hold grounds in the municipality of its existence, and may erect thereon associate meeting-houses, churches or convenient chapels. It may so do, only, when it shall deem it necessary or expedient for the accommodation of its members, in consequence of their numbers or dispersed habitations or otherwise, to increase the facilities for public worship. And the act gives to the persons statedly worshiping at such meeting-house or chapel, the privilege of becoming separately organized and incorporated, but only with the consent of such religious society.

The fact is found by the trial court, and has evidence to sustain it, that the defendant never gave its consent to the separate organization and incorporation of the plaintiff, and that its consent thereto was never asked for.

The first position taken by the plaintiff under this point is, that the defendant was not incorporated under the act of 1813, nor under a special charter. The fact is, that it was incorporated in 1809, under the prior act of March 27, 1801; (Web. & Skinner's Laws, 1 vol. [2d ed.], p. 336.) But, as is noticed by the learned General Term, a rule of pleading,

which is in fact a statute law of the State, precludes the plaintiff from occupying this position. The plaintiff's complaint alleges that the plaintiff is a body corporate, organized under the general laws of the State of New York, for the incorporation of Protestant Episcopal churches, and that the defendant is a body corporate, organized by and under the same laws. Other allegations of the complaint show, by particular statements, that the general laws meant by this general allegation, are the provisions of the act of 1813, above cited, and laws amendatory thereof. The defendant's answer admits that it is a corporation duly existing under the laws of this State, and does not deny the general allegation of the complaint. Section 168 of the Code of Procedure provides that every material allegation of the complaint, not controverted by a general or specific denial (§ 149), shall for the purposes of the action be taken as true. The reluctance of the General Term to put the decision of so important a controversy upon a rule of pleading, so narrow for the disposition of such a case, is shared in by this court. And it is to be seen, that there is other ground upon which the disposition of this particular question may be placed. It is not to be denied or doubted, but that the defendant is a corporate religious society, existing by virtue of the statute law of this State. But when we look for an existing statute, under which it could have got its corporate being in 1809, it is not now to be found in active life, nor was it to be so found in 1850. That statute of 1801, had become merged in the revision and re-enactment of 1813 (above cited), the thirteenth section of which provided that every incorporation of any church, or religious society theretofore made in pursuance of any law of this State, and in conformity to the directions contained in the act of 1813 (which were taken from the act of 1801), should be and the same was thereby confirmed, and was deemed to have commenced from the recording of the certificate of incorporation. So that in legal effect, in 1850, the defendant could find its statutory authority for corporate existence and action, in the act of 1813. It is no stretch, then, to say that

when, in 1850, the legislature gave the power above stated, to all religious societies incorporated under the act of 1813, or by special charter, it intended to include the defendant, and other religious societies in like plight with it. So that this position of the plaintiff, which for these reasons was held by the learned General Term to be untenable, is so held by this court.

The second position of the plaintiff is, that the property in question was not procured as an associate church or convenient chapel, for the accommodation of the members of the defendant. It is found as a fact, and it is amply sustained by evidence, that prior to 1850, the defendant raised moneys by voluntary contributions, to buy ground and put up a building for a free chapel; that the title thereto was taken by the defendant in its corporate name, and upon the condition that it should be always appropriated for the use of such congregation as the defendant might deem proper; and if ever it was sold, the proceeds should go to the purchase of other land, and the erection of other like building to be used in the same manner. It is found that this mode of action was kept up until a religious society was, with the consent of the defendant, incorporated from the stated worshipers there. In the meantime, one of the corporators of the defendant, with the aid and countenance of the rector of the defendant, and the aid of others of the congregation of the defendant, gathered in another part of the city children in Sabbath school, and the parents of them at public worship, and a minister was employed to officiate in his calling. The rental of rooms, the monthly wages (in part) of the minister, and some, or a part, of the other expenses of this proceeding, were paid from contributions made by persons attending upon the religious meetings of the defendant. This thing continued until after the defendant had sold the ground and building above spoken of, when, with the avails thereof, and other moneys from its treasury, and moneys raised by mortgage, and moneys obtained by the subscriptions or the exertions of the persons who afterwards became the corporate members of the plaintiff's religious society, there was bought the land and

put up the building, and got together the personal property, which were originally in question in this action. I am not able to say that this land on Fourteenth street was not other ground in the same city purchased and held by the defendant. I am not able to say that there was not erected upon it a convenient chapel. And though the persons who attended religious exercises there, were not in ecclesiastical technicality to be termed "members" of the defendant, yet I think that they were, within the intent and scope of the act of 1850, "members" of the defendant for whose accommodation, for some reason (which will be included in the terms of the statute phrase "or otherwise"), the defendant might deem it necessary or expedient to purchase and hold that land, and erect that convenient chapel. They were persons for whose religious interest and welfare the defendant had, through its rector, and in some measure its other officers, taken charge and become responsible. I think that they were, in a religious and benevolent sense, in the sense and purview of the act of 1850, members of the defendant, so that it got power from the act of 1850 to purchase land and erect a convenient chapel for their accommodation.

The next position taken by the plaintiff is, that the lack of consent from the defendant cannot invalidate the plaintiff's incorporation. It is not important to deny this. By the provisions of the act of 1813 (§ 1) the adult male persons of full age, of any congregation in communion with the Protestant Episcopal church, of twelve months' standing, and who meet certain other requirements of the act, may, by pursuing a certain method, incorporate themselves into a religious society. It may be that the act of 1850 was not intended to prevent this in any case. Yet the provision in the act of 1850 had a purpose. I think that it was enacted to preclude the assertion of a right to the temporalities, furnished by the parent society for the accommodation of its members, whom, for good reasons, it had provided with a separate place of worship. It was in view of section 4 of the act of 1813, and to guard against any attempt, surreptitiously, to obtain the prop-

erty which, by the benevolence of the religious society, had been in the actual use of the congregation worshiping in the building. If the religious society which furnished the " convenient chapel" should assent to the separate organization and incorporation of the congregation worshiping therein, it could do so in such terms as would express its assent or refusal of the further right or title to the property; as we may presume that the defendant did, when the congregation statedly worshiping in the Madison-avenue chapel, with its consent, separately organized and incorporated. In such case there would be no doubt of its purpose, nor of the rights which were meant to be given to the new society. Evidently, the purpose of the act of 1850 was to encourage the exertion of Christian benevolence, and at the same time to assure that what it gave for the purposes it had in mind, should not by the action of others, without its assent, be diverted to other objects.

It is contended that the consent of the defendant need not be in writing, to conform with the act of 1850. That act does not indeed specify that it shall be. Yet, it would seem that ordinarily to pass the title to real estate from one religious society to another, there should be somewhat else than oral declaration, or acts *en pais;* not only for the reason that it is real estate which is to be transferred, but that two corporations are the actors. The plaintiff insists that the defendant recognized the separate existence, and manifested consent to its separate organization by continued acquiescence. I have referred to the appeal book at each of the citations made by the plaintiff, and to show how far they are off from establishing the proposition made, I will make this quotation from one of the documents indicated: "In this unhappy condition of affairs, the only alternatives   *   *   *   were a recourse to the civil courts,   *   *   *   or an appeal to the corporation of Grace church, as *the owners of the property in use by our congregation,* and to whose fostering care in the past we are much indebted." The same document includes a preamble and resolution, a recital of which is that " the title to the real

estate now in use by the said congregation is vested in the corporation of Grace Church." This was in 1866, after the incorporation of the plaintiff.

I am not able to discover from the citations made upon the points, nor from my own reading of the book, that the defendant ever consented by act, or silent, intelligent acquiescence, to the incorporation of the plaintiff under the act of 1850.

The second point made by the plaintiff, is that the defendant never intended to purchase the land and erect the church on Fourteenth street as an associate church or chapel. I am compelled, by the considerate reading of the bulky volume which contains the testimony in the case, to dissent from this proposition. I will not go into detail. The conclusion at which I have arrived as a matter of fact, is that the defendant never had any other purpose in the direction of its funds towards this religious enterprise, than to create and rear a religious organization, which should be theoretically and practically under its ultimate control; which, while based upon the moneys and property of the defendant as a substantial support, should attract and keep together such a body of earnest worshipers of the Episcopal Sect as would, by its own action, maintain the current expense of a chapel of free seats. I do not find in the whole testimony any support for the idea that the defendant has by its acts, or its acquiescence, provoked such action in others, as that it is now estopped from asserting its own rights of property.

The fourth point made by the plaintiff is this : That the plaintiff was in actual possession of the property under claim of ownership until ousted, and that as no written declaration of trust was needed from the defendant, there was in fact and in law a trust in favor of the plaintiff.

It is enough to say that there is no finding by the trial court, that the plaintiff was ever in possession of the real estate under claim of ownership; while the quotation made above from a document presented to the defendant in behalf of the plaintiff, gives unqualified admission of the ownership of the defendant and of title in it while the plaintiff was in use.

Another point made by the plaintiff is that the defendant already held property, the income of which was greater than the law allowed. If this be so, it is not a fact which tends to establish a right in the plaintiff to the property in dispute. If the defendant exceeds its chartered privileges, it is for the State to make inquiry. That the defendant has no power to hold the lands, gives not the right to the plaintiff to. And if the plaintiff has the right to, it matters not whether or not the defendant has exceeded its corporate capacity. To enable a person to make inquiry into an excess on the part of a corporation in its accumulation, he must be in a position to claim an interest in the property, if it is adjudged that the corporation may not ; (*Harris* v. *Am. Bible Socy.*, 2 Abb. Ct. of App. Dec., 316.) Indeed the plaintiff urges this only as evidence corroborative of the claim, that the defendant received the title as agent or trustee for the plaintiff. I am not able to regard it so, in view of the testimony in the case, of the negotiation and purchase by defendant of the land for itself ; the erection of the building for its own purposes; and the insurance of it, and other acts in relation to it as the owner.

The seventh point of the plaintiff is as to the personal property, which was in the chapel, when the defendant placed in it another minister and excluded the plaintiff and its minister.

I discover no finding of fact which is hostile to the claim of the plaintiff for the value of the personal property in that chapel, when taken into control by the defendant to the exclusion of the plaintiff. On the contrary, there are findings that through subscriptions obtained by members of the congregation, which afterward became the corporate body of the plaintiff, considerable sums of money were received and appropriated to the purchase of personal property, and also toward the payment for the real estate. There is much testimony to show that these contributions were not sought for, given or obtained, for the use and benefit of the defendant, but for that of the congregation above spoken of ; and with the object directly in view of acquiring for it a place and the appliances of

religious resort and worship, which should belong to it in freedom from any other religious organization.   The learned justice at the Special Term did not find as matter of fact that the plaintiff had no interest in the result of these contributions.   It was with him a matter of law that it was not intended that the premises and the property claimed in this action, or any thereof, should be owned or controlled by that congregation, and that, even if such intention had been established, no valid trust was impressed upon it.   The learned General Term, after more mature consideration, came to a different conclusion as to the legality of the property being taken in trust for the religious corporation to be formed in the future, and properly, as this court thinks, declared that property, both real and personal, could be held for the use of an unincorporated religious society without any restriction as to time, except that it should terminate upon the lawful incorporation into a religious society.   This is by virtue of section 4 of the act of 1813, and it may be made to appear by parol as well as by deed; (*Foote* v. *Bryant*, 47 N. Y., 544.)   But the learned General Term seemed to think that this legal effect took place only when the property was held for the use of the future society by natural persons; and that when one religious society, as the defendant in this case, held property in its name as it held the real estate here, the act of 1850 would not permit the congregation, after incorporation, to claim it or set up and enforce a trust; and that personal property taken to the chapel for the use of the congregation was subject to the same rule.   In this, so far as it touches the personalty, this court does not concur.   The religious society which proceeds under the act of 1850 may hold no more than that which it furnishes itself or which is put into the enterprise in its name. That which is, as personal property not affixed to the realty, taken thither avowedly for the use of the congregation and at the expense of members of it, or by their efforts, and in view and declaration of the purpose of a future separate organization and incorporation, is held for the use of the congregation, is subject to the operation of section 4 of the act of 1813.

When the persons wont to assemble there for divine worship, organize into a religious society under the act of 1813, the trustees thereof are authorized and empowered to take into their custody such temporalities; so that this court feels compelled to differ from the learned courts below, and to hold that the plaintiff, on their incorporation, acquired and had the title to that portion of the above-described personalty which was in the chapel when the defendant excluded the plaintiff therefrom. It is said by the defendant that no demand was ever made by the plaintiff for it; but there was such an assumption of title and control over it by the defendant, to the denial of any right of the plaintiff therein, as to amount to an actual conversion and to obviate the need of a formal and technical demand.

It is noted by the learned General Term that the action is not at law in the nature of trover for a conversion of the property, but in equity for an accounting. It is in equity, for a judgment that the plaintiff is entitled to the personal property, and no reason exists why the court may not take equitable cognizance of the case and determine the rights of the parties in the personalty on the basis of the value of the property before it was burned.

I should be inclined to hold that the plaintiff was entitled to an accounting and payment from the defendant of the moneys raised or contributed by the members of the plaintiff's congregation, and which went into the purchase of the land and the building of the chapel, were it not that the act of 1850 gave the power to the defendant to do those acts; that in doing them it took the title in its own name, with the knowledge and acquiescence of all interested; and that the act of 1850 stands in the way of an incorporation formed from the persons accustomed to assemble there, getting the land purchased and the building erected, when the incorporation is without the assent of the parent religious society. It seems that those who permitted their money to go into the defendant's control for such purposes and under such circumstances must be charged with a knowledge of the law, and that there

is no trust impressed upon it for any after-coming religious incorporation, for the reason that the act of 1850 has, in such case, intervened between the provisions of section 4 of the act of 1813 and the prospective religious society, for the use of which it might be shown that such money was obtained.

I am, therefore, of the opinion that the judgment appealed from should be reversed so far as that there should be an accounting and payment for the personal property found in the chapel by the defendant when it excluded the plaintiff, and which was placed there for the use of the plaintiff by contributions or subscriptions made or raised by its members.

All concur; RAPALLO, J., concurring in the portions of the opinion holding title to be in defendant, and that plaintiff is entitled to an accounting for personal property.

Judgment accordingly.